March 5, 1993
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1698

UNITED STATES,

Appellee,

v.

RALPH MALING,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Andrew A. Caffrey, Senior U.S. District Judge]

Before

Breyer, Chief Judge,

Higginbotham,* Senior Circuit Judge,

and Boudin, Circuit Judge.

Joshua L. Dratel with whom Gerald B. Lefcourt, P.C., was on brief

for appellant.
Frederick E. Dashiell, Assistant United States Attorney, with

whom A. John Pappalardo, United States Attorney, and Paul V. Kelly,

Assistant United States Attorney, were on brief for appellee.

March 5, 1993

*Of the Third Circuit, sitting by designation.

BREYER, Chief Judge. Ralph Maling appeals from a

judgment imposing a fine as partial punishment for drug

crimes. He argues, in essence, that the court wanted to set

the fine at a level that would credit him with the value of

property to be forfeited. He adds that the court failed to

do so. And, the Government, he says, is responsible for

this failure. We find the district court's determinations

lawful, and we affirm its judgment.

I

Background

The reader should keep in mind the following two

sets of background events:

Forfeitures. In May 1990, Maling and the

Government entered into a Plea Agreement, in which Maling

(and several co-defendants) agreed to forfeit property that

would have a total value of $2.8 million. In September

1990, Maling signed a separate agreement in which he

promised to forfeit assets (listed in the agreement's

Appendix A) including some condominiums owned by J & R

Properties, Inc., a firm of which he and James Taglienti

each owned half. On September 20, 1990, the district court

entered an initial "Amended Order of Forfeiture," which

listed the condominiums (among other properties) as items

subject to forfeiture (the forfeiture itself to take place

only after the court had an opportunity to consider any

competing claims to the property). See 21 U.S.C. 853(a),

(p) (providing for assets to be made subject to forfeiture);

853(n)(7) (providing a mechanism for forfeiture actually

to occur); United States v. Schwimmer, 968 F.2d 1570, 1576

n.4 (2d Cir. 1992) (interpreting the RICO equivalent of

853(n)(7) as implying that the Government does not take good

title to forfeited property until after competing claims are

determined); Amended Order of Forfeiture, 8. On November

13, 1990, Taglienti filed a petition objecting, under 21

U.S.C. 853(n), to the forfeiture of the J & R condominiums

on the ground that he (through J & R) owned a half interest

in them. The Government then refused to accept the

condominiums as satisfying (in part) Maling's forfeiture

obligation. And, on May 26, 1992, the district court

entered a "Final Order of Forfeiture," which forfeited other

property, but which specifically said that the condominiums

were not forfeited.

The Fine. In September 1990, the district court

imposed a fine of $250,000 as partial punishment following

Maling's guilty plea to drug charges. Maling appealed. See

United States v. Maling, 942 F.2d 808 (1st Cir. 1991)

-3-
3

("Maling I"). He argued that the Plea Agreement had assumed

that the defendants would pay no more (in fines plus

forfeitures) than $2.8 million total. He added that the

fine plus forfeitures would exceed that amount. We agreed

that the Plea Agreement did assume a $2.8 million "ceiling,"

but we held that the Plea Agreement bound the parties, not

the district court. Nonetheless, we concluded that there

had been "confusion during the sentencing proceedings about

the meaning of the Plea Agreement." And, because of that

confusion, we would "vacate the sentence insofar as it

imposes fines . . . and remand for resentencing in respect

to fines." Id. at 811. We said specifically:

Although the Agreement does not bind the

district court, we believe the

appellants should now be sentenced with
the district court fully aware of the
Agreement's efforts to impose a $2.8
million cap upon the appellants' total
financial liability.

Id. (emphasis added).

On remand, the district court received written

submissions from the parties and held three further

hearings. The court said that it wished to impose fines

such that the "total financial liability" would amount to

$2.8 million. The court then entered judgment imposing a

-4-
4

fine of $634,000 against Maling. He now appeals that

judgment.

-5-
5

II

The Size of the Gap

The district court made clear that its basic

objective in assessing a fine in the amount of $634,000 was

to fill a gap -- the gap between the value of the assets

forfeited and the $2.8 million Plea Agreement "ceiling."

Maling says the district court was mistaken in believing

there was such a gap. In particular, he says, the gap was

filled, without the fine, by 1) his forfeiture of

condominiums owned by J & R Properties, Inc., valued at

$300,000, and 2) his forfeiture of property in Westwood,

valued at $335,000. The Government refuses to accept the

condominiums; it agrees that Maling forfeited the Westwood

property after entry of the $634,000 judgment and that the

judgment must be modified to take its value into account.

(The district court expressly left the judgment open for

sixty days so that it could be modified.) The Government

disagrees, however, about the value of that property.

The upshot is that the Government believes Maling

must pay a fine of $344,000, while Maling believes he need

not pay any fine at all. The difference reflects the

disagreements about whether the Government must accept the J

& R condominiums (worth $300,000) and about the value of the

-6-
6

Westwood property (the difference in valuations amounting to

$45,000).

Before turning to the disagreements, we point out

that the district court has broad legal powers to determine

the amount of the fine. See Fed. R. Crim. P. 11(e)(1)(B);

Maling I, 942 F.2d at 810 (court not bound by sentencing

recommendations derived from Plea Agreement) (citing cases);

21 U.S.C. 848(a) (authorizing a fine of up to $2 million

for one of the offenses of which Maling was convicted);

U.S.S.G. 5E1.2(c)(4) (Sentencing Guidelines do not

constrain fines where statute authorizes fines in excess of

$250,000); United States v. Savoie, No. 92-1920, slip op. at

14-15 (1st Cir. Feb. 8, 1993) (appellate review of fines

imposed by the district court is under "an abuse-of-

discretion rubric" only). The court was not legally

compelled to limit its fine to the size of the gap (though

it quite reasonably chose to do so). Similarly, the court

was not legally required to measure the gap precisely or to

engage in professional matters of appraisal or make

technical property law determinations in doing so. The law

would permit the court to assess its fine on the basis of a

rough estimate of the gap size, or on an assumption that the

Government would probably, but not definitely, win disputed

-7-
7

matters in respect to what was, or what was not, forfeitable

under the Plea Agreement. For this reason, we review the

district court's judgments about "gap size" with a degree of

deference.

a. The J & R Condominiums. Maling must concede

that there is a $300,000 gap, for, in fact, he has not

forfeited the J & R condominiums. Rather, he argues that

the Government should have accepted the condominiums for

forfeiture, and the district court should have assessed the

fine as if the government had done so. His claim that the

Government had to accept the condominiums stems from the

Plea Agreement, which says that the parties will enter into

a "separate agreement" that "specifically describe[s]" the

"property and assets" to be forfeited. That "separate

agreement" (as we have said) lists the J & R condominiums

among those assets. Consequently, says Maling, the

Government, having signed this "separate agreement," cannot

later reject the assets that it listed.

The Plea Agreement, however, contains an important

qualification. It says that "physical assets" will satisfy

the "forfeiture" obligation only if those physical assets

are "without any encumbrances." This qualification affects

the "separate agreement" subsequently made pursuant to the

-8-
8

Plea Agreement. Thus, we read the Government's September

1990 agreement, accepting the forfeiture of "[a]ny and all

interest of J & R Properties, Inc." (our emphasis) in the

condominiums (not merely the "interest" of Maling) as

conditioned on the condominiums' being unencumbered when

forfeited. As we have said, after the parties signed that

"separate agreement" and after Maling (as J & R's President

and Treasurer) purported to convey the J & R condominiums to

the Government (but before the forfeiture order was final),

Maling's J & R co-owner James Taglienti filed a petition

with the court, under 21 U.S.C. 853(n), objecting to the

forfeiture on the ground that he had a fifty percent

interest in the condominiums. The Government asked the

court to omit the condominiums from its final forfeiture

order because it considered the petition an "encumbrance."

Maling argues that neither the petition (nor a

later-filed state tax lien, which we need not consider)

amounts to an "encumbrance." First, he says that

Taglienti's petition is without legal merit, for Taglienti,

too, was involved in (or knew about) relevant drug

activities, which involvement would prevent him from saving

his interests in the condominiums from forfeiture. See 21

U.S.C. 853(c), (n)(6). He adds that, even if Taglienti's

-9-
9

petition is otherwise valid, the Government received title

documents from J & R's President and Treasurer (Maling) in

"good faith," which fact, under Massachusetts law, means the

Government takes title free of Taglienti's asserted

interests. Mass. Gen. L. ch. 155, 8; ch. 156B, 115; cf.

United States v. New Silver Palace Restaurant, Inc., 1992 WL

404160 (E.D.N.Y. Nov. 25, 1992) (finding shareholders'

rights in respect to corporate assets to be an inadequate

basis for a petition against forfeiture under 21 U.S.C.

881).

We need not consider whether or not Maling is

correct about the merits of Taglienti's claim, however, nor

need the district court have done so. We read the phrase

"without any encumbrances" as one who buys property would

likely read it, namely as imposing upon the conveyer an

obligation to clear up any asserted legal claims upon that

property prior to transfer, so that the buyer will receive

the property alone, instead of receiving "the property plus

the obligation to fight a lawsuit" (regardless of whether

the lawsuit ultimately turns out to be unfounded). See

American Law of Property 18.84 (A. James Casner ed., 1952)

("A pending action assailing a vendor's title or asserting

an interest therein or a lien thereon of which a purchaser

-10-
10

has notice is at least a cloud on the title. Since a court

will not compel a purchaser to 'buy a lawsuit,' the pendency

of one of the character indicated is an encumbrance.")

(citations omitted). Such a reading would avoid imposing

upon the Government title-clearing obligations that it does

not wish to undertake, without (ordinarily) harming the

potential transferor (who simply would retain whatever

property interest he previously owned). Maling points to

nothing that might suggest that this natural reading of the

agreement is incorrect.

Such a reading ends the argument. To adjudicate

the merits of Taglienti's claim would require a legal

proceeding (perhaps a rather complicated one), as would any

effort to demonstrate that the Government (which had long

known that Taglienti was Maling's J & R co-owner) was a

"good faith" transferee entitled to clear title in all the

property, irrespective of the merits of Taglienti's claim.

See Mass. Gen. L. ch. 155, 8; ch. 156B, 115 (requiring

"good faith" for transferee of real estate from corporation

to take free of rights of owners of corporation). Hence, we

see nothing unlawful about the district court construing the

Plea Agreement's word "encumbrance" as encompassing the

Taglienti petition.

-11-
11

Maling also claims that the Government is

"estopped" from refusing to accept the condominiums.

Estoppel, however, requires a statement or promise or action

that leads to reasonable reliance to one's detriment. See,

e.g., Restatement (Second) of Contracts 90(1) (1981) ("A

promise which the promisor should reasonably expect to

induce action or forbearance on the part of the promisee . .

. and which does induce such action or forbearance is

binding if injustice can be avoided only by enforcement of

the promise.") (emphasis added). We cannot find a statement

or action by the Government, in respect to the condominiums,

that led Maling reasonably to rely to his detriment on the

Government's keeping the condominiums despite a pre-final-

order "encumbrance" which, under the plea agreement,

entitled it to reject them. The Government, we concede,

knew (as, of course, did Maling) that Taglienti was a J & R

co-owner long before the condominiums appeared on the

"separate agreement" forfeiture list. But, Maling points to

no statement or action that suggests that the Government,

rather than Maling, was responsible for preventing any such

legal "cloud" upon the property from arising, or for

removing it once it arose. We also concede that the

Government, for a time, accepted condominium rents

-12-
12

(presumably because it anticipated that forfeiture would

transfer the property to the Government with retroactive

effect, 21 U.S.C. 853(c)). But, we do not see how Maling

is any the worse for its having done so (assuming, of

course, that the Government pays over to him the rents it

received). That is to say, we do not see how the

Government's returning the property makes Maling

significantly worse off than had the Government never

included the property on the "separate agreement" list in

the first place. The district court could reasonably have

found no "reliance to his detriment" on Maling's part and

therefore no "estoppel."

Maling's strongest argument is that he wanted to

clear Taglienti's "encumbrance;" indeed, he asked the court

to permit him to prove that Taglienti was not the kind of

"good faith" or innocent owner who could object to

forfeiture of his own (i.e., Taglienti's) interest in the

property. See 21 U.S.C. 853(n)(6). But, once the

Government told the court that it did not want the

condominiums, the court simply denied Maling's request as

"moot." Maling, in essence, asks, "How can the Government

turn down the property as encumbered without letting me

remove the encumbrance?"

-13-
13

The short, conclusive answer to this question lies

in the Plea Agreement itself. It says the Government can

turn down encumbered property. It does not say the

Government must give Maling a chance to remove an

encumbrance. And, we will not read such a right into the

Agreement, at least, in respect to this kind of removal of

an encumbrance. Maling does not offer to show that

Taglienti does not own the property. Rather, he wants to

intervene in the special statutory "third party versus

Government" proceedings to show that the Government could

defeat Taglienti's interest, if it decided to try to do so.

21 U.S.C. 853(c), (n)(6). But, the statute creates those

special proceedings, placing a special burden on third

parties to prove that they have "clean hands," in order to

benefit the Government. See S. Rep. No. 225, 98th Cong., 2d

Sess. 82, 191-92, 208, reprinted in 1984 U.S.C.C.A.N. 3182,

3265, 3374-75, 3391 (expressing purposes of removing

obstacles in the way of federal law enforcement agencies

seeking forfeiture, of ensuring expedition, and of

protecting third parties); United States v. Regan, 858 F.2d

115, 121 (2d Cir. 1988) ("orders directed at third parties

are strong medicine and should not be used where measures

that are adequate and less burdensome on the third parties

-14-
14

are available."). They are not designed to help defendants

who would like to see some other person's property

forfeited, thereby perhaps obtaining credit. Thus, we think

the court acted lawfully in denying Maling's petition for

such a proceeding.

Is this result unfair to Maling? One can imagine

circumstances that could make it seem so. Suppose, for

example, that the Government, knowing full well that

Taglienti would likely create an encumbrance (i.e., file a

petition objecting to the forfeiture) led Maling down the

garden path. On the other hand, one can easily imagine

circumstances that indicate the contrary. Suppose, for

example, that the Government assumed that Taglienti would

not object (or that Maling could persuade him not to

object); or, suppose that the Government did not think about

the matter and Maling simply saw a fleeting opportunity to

satisfy a portion of his debt with someone else's property.

Regardless, this kind of ultimate fairness or unfairness to

Maling would arise out of facts and circumstances of which

we know little. And, it is beside the point. The

Government and Maling signed an Agreement the language of

which placed the risk of this, and any other, encumbrance

upon Maling. In all likelihood the Government wanted this

-15-
15

language so that it would not have to become involved in the

kind of property law disagreements that Maling now raises.

The district court so interpreted the Agreement. It based

its fine upon that interpretation. In our view, the

district court's view is reasonable; and the resulting fine

is therefore lawful.

b. The Westwood Property. Maling argues about the

value of his forfeited Westwood property, property which was

not included in the September 1990 "separate agreement" list

and which he offered to forfeit for the first time in about

September 1991. An appraisal made about seventeen months

earlier (before the plea agreement) valued the property at

$335,000. By late 1991, when Maling offered the property to

the Government, its value had declined to $245,000. The

Government told the court that, for purposes of assessing

the "gap-filling" fine, it would assume the property was

worth $290,000, thereby "splitting the difference" between

the two evaluations.

Maling argues that he should be credited with the

higher valuation. But, we can find no promise by the

Government that it would do so. And, in the absence of such

a promise, we are aware of no law that would prevent the

Government from advising the court that the property should

-16-
16

be assessed at $290,000 for "gap-filling" purposes. In the

absence of some specific agreement about valuation dates,

"splitting the difference" does not seem unreasonable to us;

and we do not know why the district court could not have

reached a similar conclusion.

-17-
17

III

Recommending a Fine

The Plea Agreement, while leaving the court free

to impose a fine, nonetheless prohibits the Government from

recommending a fine. See Maling I, 942 F.2d at 810-11.

Maling says that the Government violated this obligation

when counsel told the district court, for example:

If the Court is entertaining the thought
of a fine, my suggestion in [sic] how
that should be fashioned . . . is that
the Court should issue an order of a
criminal fine in the amount of $634,000.

Taken out of context, this statement, and a few others like

it, might suggest a not-very-subtle attempt to avoid the "no

recommendation" obligation. Cf. United States v. Canada,

960 F.2d 263, 269 (1st Cir. 1992) (we will not allow the

Government to pay "lip service" to a plea agreement and then

do "end-runs" around it). But, in context, the statements

are perfectly proper.

The context reveals that the district court had

already decided to impose a fine despite the absence of a

fine recommendation. The context makes clear that the court

wanted, or could benefit from, discussion, recommendations,

and argument from all counsel, about the amount of fine that

would keep the total monetary liability within the $2.8

-18-
18

million "ceiling." Government counsel, stating specifically

that the "U.S. Government is not recommending to this Court

that they [sic] impose a fine," went on to respond to the

court's request to help it determine the proper amount of

the fine that the court independently had decided to impose.

We see no violation of the Plea Agreement.

The judgment of the district court is

Affirmed.

-19-
19